IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

D.J., parent and natural guardian on behalf )
of C.J., a minor, and D.J., in her own right, )
       Plaintiff, )
      )
    vs. )    Civil Action No. 07-579
      )
STEVENS ELEMENTARY SCHOOL, )
MARK ROOSEVELT, Superintendent, )    Judge McVerry
Pittsburgh Public Schools, JOSEPH )    Magistrate Judge Mitchell
FORISKA, Principal, XAVIER, minor, )
and T.P., a minor, )
       Defendants. )

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of defendants Stevens Elementary School, Mark Roosevelt, and Joseph Foriska (Docket

No. 35) be granted. It is further recommended that the motion for summary judgment submitted

on behalf of defendant T.P. (Docket No. 37) be granted, that the case be dismissed as to

Defendant Xavier and the judgment be entered accordingly.

II.    Report

Plaintiff, D.J., parent and natural guardian on behalf of C.J., a minor and in her own right,

brings this action against Defendants, Stevens Elementary School ("Stevens"), Mark Roosevelt

(the Superintendent of Pittsburgh Public Schools), Joseph Foriska (principal of Stevens), and

minors Xavier and T.P. Her claims arise out of an incident that occurred on or about January 3,

2007 when the complaint alleges that C.J., then an eleven-year old student at Stevens, was

attacked in a bathroom by other students including Xavier and T.P. In this lawsuit, Plaintiff

seeks to impose liability on Xavier and T.P., as well as on Stevens, Roosevelt and Foriska (together, the "School District Defendants"). She claims violations of her civil rights under the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution and she brings this action pursuant to 42 U.S.C. § 1983. She also raises conspiracy claims under 42 U.S.C. §§ 1983 and 1985(3) and she may be raising a racial discrimination claim under 42 U.S.C. § 1981. Finally, she alleges state law claims of assault and battery, intentional infliction of emotional distress and negligence.

Presently before this Court for disposition are two motions for summary judgment, one brought by the School District Defendants and the other by T.P. For the reasons that follow, the motions should both be granted.

Facts

Based on the allegations of the Amended Complaint, while C.J. was in the bathroom at Stevens on January 3, 2007, T.P. (a female student) crawled underneath the stall and unlocked the door. At this point, T.P. and several other students grabbed C.J. while her pants were still down and threw her against the wall outside the stall, causing her to strike her chin, jaw and face on the mirror above the sink. Other students were laughing at C.J. because they saw her private parts, causing her even further humiliation. She was then assaulted by Xavier, a male student. (Am. Compl. ¶ 17.)[1] Plaintiff further alleges that C.J.'s younger sister Mya came into the bathroom and witnessed several girls hitting her sister in the face and body and there was boy standing over her sister, that Mya ran over to her sister and observed C.J. lying there with her head backwards and she was not responding, and that Mya ran out to a classroom and got Mr.

---

[1]Docket No. 7.

Scott, a teacher, who came into the bathroom but the students were hiding behind the stall doors and he did not look behind the stall doors and get the names of the students who did this to C.J. or call for any medical assistance.  (Am. Compl. ¶ 18.)

T.P. admits crawling underneath the stall and unlocking the door, but denies that she helped grab C.J., that she threw C.J. against the wall outside the stall, that she laughed at C.J., or that she saw C.J.'s private parts.  Furthermore, T.P. denies that C.J. was grabbed directly from the toilet seat and denies that C.J. was not able to pull her pants up (so as to cover her private parts) before T.P. entered the stall and before the door was unlocked.  (T.P. Answer ¶ 17.)[2]  T.P. admits that Mya entered the bathroom, that at some point thereafter Mr. Scott entered the bathroom and that some of the girls were hiding behind stalls.  (T.P. Answer ¶ 18.)

C.J.'s younger sister, Mya Owens, states that:

> On January 3, 2007, I was in the library.  We were given a bathroom break and I was at the doorway of the bathroom, the door was propped open and I saw three students kicking and hitting my sister.
>
> [C.J.] was trying to fight back, but was pinned.  I saw there was a boy in the girls bathroom, he was watching and telling the girls to hit her.
>
> I ran down the hall to find a teacher.  I told the first teacher I saw and she told me "there is no one in the bathroom."  She was teaching her class and did not believe me.
>
> Then I went back to the library and told my substitute teacher, but she did not do anything either.

(Owens Aff. ¶¶ 2-5.)[3]

Plaintiff alleges that C.J. was sent back to her classroom without any further questions

---

[2]Docket No. 33.

[3]Pl.'s Br. Opp'n School Dist. Defs.' Mot. Summ. J. (Docket No. 48) Ex. 1.

being asked or help offered to her even though she had been found unconscious and bleeding. At no time was her parent/guardian made aware of what had transpired. (Am. Compl. ¶ 19.) While she was in the classroom, some of the abusers were passing her notes saying they would kill her if she told anyone what had happened. They also shot spitballs into her hair, calling her names and laughing at her. The teacher never stopped any of this behavior, offered to remove C.J. from this environment or offered any assistance to C.J. Plaintiff alleges that the Vice Principal had in his possession the notes C.J. received from the abusers and knew what was going on in the classroom, but he made no effort to remove her from it or to punish the perpetrators. (Am. Compl. ¶ 20.)

Indira Jeyram, who was the substitute teacher in charge of the class that included C.J. on January 3, 2007, states that:

> There was a bathroom break during our class at about 10:30 a.m. to 10:50 a.m.
>
> As C.J. returned from the bathroom, some of her friends told me that C.J. was upset.
>
> During this class period, C.J. was not upset. I did not notice anything unusual about her appearance or behavior. I did not notice any physical injury to her. C.J. went with her book to her normal table with her friends and started working on her book.
>
> At no time during the class period did C.J. or any of the other children in the class inform me of any specific event that occurred in the bathroom during the break.

(Jeyram Aff. ¶¶ 1-5.)[4]

Plaintiff alleges that, immediately after class had ended that day, C.J. went back to her

_____

[4] School Dist. Defs.' Br. (Docket No. 36) Ex. D.

classroom for her book bag so she could put some of her notes in it. Some students grabbed her arms and pinned them behind her back while other students hit and scratched her and placed tape over her mouth so she could not scream. C.J. immediately went to her teacher, Ms. Corals, who did nothing regarding the incident. (Am. Compl. ¶ 21.)

D.J. explains that, when C.J. came home that day:

> I knew that something was wrong because she was quiet and had bruises and swelling on her face.
>
> Later I found blood on her underwear. [C.J.] had not started her menstrual cycle before the incident.

(D.J. Aff. ¶¶ 2-3.)[5]

C.J.'s grandmother, Ella Jones, states that:

> When my granddaughter came home I knew that something was wrong because she had scratches and bruises on her neck and wrist.
>
> Furthermore there was dried blood on her nose and her face was swollen.
>
> My granddaughter's hair was out of place and she had a look in her eye that told me something had happened.

(Jones Aff. ¶¶ 2-4.)[6]

<u>The Meeting on January 4, 2007</u>

D.J. states that:

> Because no one from the school had called me about the incident I called 911. The officers told me to call the school police.
>
> After calling the school police an[] appointment was made to meet with them the next morning. When I arrived they had already begun to question the

---

[5]Docket No. 48 Ex. 1.

[6]Docket No. 48 Ex. 1.

teachers and principal.

The statement that the school police showed me was incorrect and did not reflect what my daughter had told me about the incident.

When [C.J.] was giving her statements the principal was gritting her teeth and otherwise making facial gestures that were meant to intimidate my daughter.

I was told by the principal that my daughter was not a victim.

...

When I attempted to withdraw my children from Steven's [sic] School I was told that I could not because there was no serious cause for them to be removed to another school district.

(D.J. Aff. ¶¶ 4-8, 10.)

Joseph Foriska, Principal at Stevens from July 1998 to June 2008 (Foriska Aff. ¶¶ 1-2),[7] states that: "As a result of the events of January 3, 2007, Defendant, minor, T.P. was given a two day suspension, and C.J. was assigned to a different home room for the remainder of the 2006-2007 school year." (Foriska Aff. ¶ 11.) D.J. confirmed at her deposition that, at the meeting on January 4, 2007, it was determined that C.J.'s homeroom assignment would be changed. (D.J. Dep. at 59.)[8] She also confirmed that T.P. would be given a suspension, although she described T.P. as C.J.'s friend and a witness to the incident. (D.J. Dep. at 42-44.) Nevertheless, she has named T.P. as a defendant in this case.

C.J. is Taken to Children's Hospital

D.J. states that: "Two days after the incident [C.J.] was taken to Children's Hospital by her grandmother to document injuries caused by the incident." (D.J. Aff. ¶ 9.) Ella Jones

_____

[7]Docket No. 36 Ex. C.

[8]Docket No. 36 Ex. A.

confirms that:

> I went with my granddaughter to Children's Hospital.

> At the hospital they took pictures of her back, neck, legs, face, and wrists because of the injuries that they found there.

> I also went with my granddaughter to Mercy's Child's Place.

> I signed all of the necessary paperwork to have her examined.

(Jones Aff. ¶¶ 5-8.)

D.J. alleges that, at Children's Hospital, she was told to take all of C.J.'s clothes, put them in a plastic bag and bring them to the hospital so they could be tested for rape. D.J. was also interviewed by two Pittsburgh police officers about the incident. D.J. later took C.J. for a CT scan of her head and took her clothes to the hospital for further examination. (Am. Compl. ¶¶ 27-28, 31.)

D.J. heard from one of the security guards at school, who suggested that she go to the local magistrate's office and file a formal complaint. The guard asked how C.J. was doing. D.J. repeatedly called the school and asked to speak to the principal. She was told he would get back to her if he thought it was important. He never got back to her. (Am. Compl. ¶¶ 29-30.)

Procedural History

Plaintiff filed this action on May 2, 2007 and on October 22, 2007, she filed an amended complaint. Jurisdiction is based on the federal questions presented, 28 U.S.C. §§ 1331 and 1343(a)(3). Count I is brought pursuant to § 1983 and it alleges that the School District Defendants deprived C.J. of her civil rights under the First, Fourth, Fifth and Fourteenth Amendments, that they subjected her to a hostile environment with respect to her race and

disability, that they retaliated against her based on her race and disability and/or perceived ability, that D.J. complained about the hostile school environment but nothing was done in response, that Stevens has a policy or practice of deliberate indifference to instances of known or reasonably suspected hostile school environment, and that Roosevelt and Foriska acted intentionally to deprive her of the equal protection of the laws. Count II alleges that all Defendants conspired to deprive her of her civil rights, in violation of §§ 1983 and 1985(3). Count III raises claims of assault and battery against Xavier and T.P. under Pennsylvania law. Count IV is a supplemental state law claim of intentional infliction of emotional distress asserted against all Defendants. Count V is a supplemental state law claim of negligence asserted against the School District Defendants.

On March 11, 2008, a competency hearing was held, at which the undersigned made a tentative finding that C.J. was not competent to testify in this case. (Docket No. 29.) The finding was made subject to rebuttal, to be submitted by April 15, 2008. No rebuttal was submitted. Therefore, the finding that C.J. is not competent to offer testimony in this case is final.

On July 8, 2007, the School District Defendants filed a motion for summary judgment. On July 11, 2008, T.P. filed a motion for summary judgment.[9]

Standard of Review

---

[9]Xavier has not made any appearance in this case. On July 24, 2008, Plaintiff moved for default and default judgment against him. On August 5, 2008, default was entered against him and a hearing was scheduled to address the issue of damages with respect to Plaintiff's motion for default judgment. At the hearing on September 3, 2008, it was determined that default judgment could not be entered because Xavier is a minor and no guardian had entered an appearance for him in the case. Fed.R.Civ.P. 55(b)(2). (Docket Nos. 44-45.)

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130; Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993).

The School District Defendants argue that: 1) Plaintiff cannot maintain claims under the First, Fourth and Fifth Amendments, because she has alleged no facts to support such claims; 2) similarly, she cannot maintain a claim under § 1981 based on bare allegations of racial discrimination, and both Roosevelt and Foriska have testified that they did not discriminate against C.J. based on her race; 3) she cannot maintain a claim under the substantive due process

clause because she has not met the standard for the state-created danger theory; 4) she cannot establish violations of §§ 1983 or 1985(3) because there is no evidence of a conspiracy; 5) she cannot maintain a claim for intentional infliction of emotional distress because these local agency defendants are entitled to immunity; and 6) she cannot maintain a claim for negligence because none of the exceptions to local immunity could lead to a finding of a liability against Stevens.

T.P. argues that: 1) Plaintiff provides no evidence that she was acting under color of state law and therefore no claims can be maintained against her under §§ 1983 or 1985(3) and there is no evidence to support the allegation that T.P. acted in concert with the School District Defendants; 2) Plaintiff provides no evidence that T.P. acted with racial or class-based animus; 3) the assault and battery claim is not supported by evidence because all Plaintiff relies on are the allegations of the Amended Complaint and inadmissible hearsay; and 4) the claim of intentional infliction of emotional distress fails because the allegations against T.P. do not rise to the level of outrageous behavior and because Plaintiff has not substantiated this claim with medical evidence.

Counts I-II: Section 1983 Claims

It is provided in 42 U.S.C. § 1983 that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

The Supreme Court has held that § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). "The

first step in any such claim is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). See also Baker, 443 U.S. at 140; Graham v. Connor, 490 U.S. 386, 394 (1989). However, "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather, we examine each constitutional provision in turn." Soldal v. Cook County, Illinois, 506 U.S. 56, 70 (1992).

First, Fourth and Fifth Amendments

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. 1. "First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907 n.43 (1982). The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated ...." U.S. Const. amend. IV. This provision has been made applicable to the states by the Fourteenth Amendment. Ker v. California, 374 U.S. 23, 30 (1963). The Fifth Amendment provides, inter alia, that no person shall be "deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V.

Plaintiff mentions these Amendments in her Amended Complaint but states no facts related thereto. Her brief in opposition to the School District Defendants' motion for summary judgment contains a section heading stating that she "can establish that C.J.'s rights under the First, Fourth [and] Fifth .... Amendments to the Constitution ... were violated by Defendants, Stevens, Roosevelt, and Foriska." (Docket No. 48 at 3.) However, the brief contains no

discussion of these claims. Moreover, the due process clause of the Fifth Amendment does not apply to the acts of state government or state officials, but only the federal government. <u>Bartkus v. Illinois</u>, 359 U.S. 121, 124 (1959). No federal officials are mentioned in the Amended Complaint. Therefore, the First, Fourth and Fifth Amendments are not implicated in this case.

<u>Fourteenth Amendment</u>

The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Plaintiff alleges that the actions of the School District Defendants violated the Equal Protection Clause and the Substantive Due Process Clause by depriving C.J. of her liberty interest in bodily integrity. "Individuals have a constitutional liberty interest in their personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 235 (3d Cir. 2008) (citations omitted). Therefore, the Fourteenth Amendment is implicated in this case.

<u>Substantive Due Process Claim</u>

As the Supreme Court has explained, it is "the substantive component of the Clause that protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992) (quoting <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986)). In <u>Collins</u>, the Supreme Court clarified that "proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: 1) whether plaintiff's harm was caused by a constitutional violation, and 2) if so, whether the city is responsible for that violation." <u>Id.</u> at 120. Thus,

Plaintiff does not argue that Defendants denied C.J. her right to bodily integrity without affording her appropriate procedural protections, but that they are liable for the attacks she suffered as a general matter.

In <u>D.R. by L.R. v. Middle Bucks Area Vocational Technical School</u>, 972 F.2d 1364, 1368 (3d Cir. 1992) (en banc), a minor child (D.R.) alleged that several male students in a graphic arts class physically, verbally and sexually abused her over the course of a school year by grabbing her and forcing or carrying her into a unisex bathroom or a darkroom, both of which were part of the graphic arts classroom. Although D.R. did not report these incidents to the student teacher, Susan Peters, she alleged that "Peters was or should have been in the classroom during the time of the acts complained of and either heard or should have heard the incidents taking place." <u>Id.</u> at 1366. In addition, a public high school student (L.H.) alleged that, after another student attempted to force her into the bathroom, she reported this incident to the assistant director of the school, but he failed to take any corrective action. The court held that the students possessed a liberty interest in their own bodily integrity but, as discussed below, none of the theories that the plaintiffs articulated were sufficient to impose liability on the state.

In <u>Collins</u>, the Supreme Court rejected a claim asserted on behalf of a sanitation worker who died of asphyxia after entering a manhole to unstop a sewer line because "the Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimum levels of safety and security in the workplace." 503 U.S. at 130. As the Supreme Court has stated:

> Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the

> government itself may not deprive the individual. If the Due Process Clause does
> not require the State to provide its citizens with particular protective services, it
> follows that the State cannot be held liable under the Clause for injuries that could
> have been averted had it chosen to provide them.

DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196-97 (1989) (citations

and footnote omitted). Thus, no liability attached when county authorities, although aware that

Joshua DeShaney might be a victim of child abuse, nevertheless placed him in the custody of his

father, who beat him to the point that he suffered brain damage so severe that he was expected to

spend the rest of his life confined to an institution for the profoundly retarded.

Plaintiff does not argue that School District officials are obligated under the Substantive

Due Process Clause to provide a school environment free from sexual harassment by other

students; such an argument would have to be rejected on the basis of Collins and DeShaney.

However, she has argued that the "special relationship" exception to the general proposition that

the state does not have a duty to protect its citizens from the actions of others applies because

C.J. a minor with learning disability, could not differentiate between compulsory school

attendance and custody. She also contends that the "state-created danger" theory applies.

Special Relationship Theory of Liability

In DeShaney, the plaintiffs had argued that county authorities were in a "special

relationship" with Joshua DeShaney because they knew that "he faced a special danger of abuse

at this father's hands, and specifically proclaimed, by word and by deed, [their] intention to

protect him against that danger." 489 U.S. at 197. The Supreme Court reviewed the cases cited

to support this argument and held that:

> they stand only for the proposition that when the State takes a person into its
> custody and holds him there against his will, the Constitution imposes upon it a

corresponding duty to assume some responsibility for his safety and general well being.  The rationale for this principle is simple enough:  when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs–e.g., food, clothing, shelter, medical care, and reasonable safety–it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.  The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.  In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf–through incarceration, institutionalization, or other similar restraint of personal liberty–which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

Id. at 199-200 (citations and footnotes omitted).

The attempt to allege a special relationship theory for school children was rejected by the Court of Appeals for the Third Circuit in 1992 in the D.R. case  The court held that no special relationship existed between minor student D.R. and her teachers based on Pennsylvania's compulsory education law so as to impose liability on the school district when she was molested by other students during school hours:

By requiring D.R. to attend assigned classes at Middle Bucks as part of her high school educational program, and authorizing officials to engage in disciplinary control over the students, the school defendants did not restrict D.R.'s freedom to the extent that she was prevented from meeting her basic needs.  Thus, the school defendants' authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in DeShaney, particularly when their channels for outside communication were not totally closed.

972 F.2d at 1372 (citing Fialkowski v. Greenwich Home for Children, Inc., 921 F.2d 459, 465-66 (3d Cir. 1990)).[10]

---

[10]Other circuits have followed this approach.  See Doe v. Hillsboro Independent Sch.

(continued...)

Plaintiff cites A. ex rel. B. v. Laredo Independent School District, 2007 WL 189458 (S.D. Tex. Jan. 22, 2007). In that case (which had facts similar to this one, namely a child being allegedly attacked by other children in a school bathroom), the court noted that the Supreme Court had indicated that, "[e]xcept perhaps when very young, the child is not physically restrained from leaving school during school hours...." Id. at *3 (quoting Ingraham v. Wright, 430 U.S. 651, 670 (1977)). The court recognized that B. was seven years old at the time the various incidents took place and was younger than any of the children at issue in analogous caselaw. The court observed that it was difficult to conclude that B.'s compulsory attendance was not equivalent to confinement. Nevertheless, the court noted that it was not clear that the Fifth Circuit would consider B.'s age as a variable worthy of distinguishing treatment. Moreover, even assuming custody, the court stated that the plaintiff would still have to prove deliberate indifference, not mere negligence, and that the complaint failed to do so. Therefore, the court held that the special relationship theory of liability did not apply. Id. at *4.

The difficulty with Plaintiff's argument is that the Court of Appeals for the Third Circuit held in D.R. that the "special relationship" exception does not apply in a school setting. 972 F.2d at 1372. There is no basis for concluding that the Third Circuit would consider C.J.'s "mental age" as a variable worthy of distinguishing treatment. The court in D.R. did not recognize any

---

[10](...continued)
Dist., 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc); Doe v. Claiborne County, Tenn., 103 F.3d 495, 510 (6th Cir. 1996); J.O. v. Alton Community Unit Sch. Dist. No. 11, 909 F.2d 267, 272-73 (7th Cir. 1990); Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729, 732 (8th Cir. 1993); Maldonado v. Josey, 975 F.2d 727, 732-33 (10th Cir. 1992); Wyke v. Polk County Sch. Bd., 129 F.3d 560, 569 (11th Cir. 1997). But see Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999) (suggesting that under certain narrow circumstances, schools might have a duty to protect children based on this theory, but noting that the case would require "pungent facts").

distinction based upon a child being "very young."[11]  Rather, the court's decision was based upon its analysis of Pennsylvania's compulsory attendance law for children and its conclusion that "parents remain the primary caretakers, despite their presence in school," id. at 1371.  Based upon binding precedent in the Third Circuit, Plaintiff cannot maintain a claim based upon the special relationship theory.

State-Created Danger Theory of Liability

Plaintiff also argues that the "state-created danger" theory applies in this case.  The Court of Appeals has noted that:

> DeShaney stands for the proposition that the Due Process Clause imposes no affirmative duty to protect a citizen who is not in state custody.  [H]owever, this does not mean that no constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him "more vulnerable to injury from another source than he or she would have been in the absence of state intervention."  Schieber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003).  This complement to the DeShaney holding has come to be known in its progeny as the "state-created danger doctrine."

Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (footnote omitted), cert. denied, 127 S.Ct. 1483 (2007).

The Court of Appeals has adopted a four-part test for the state-created danger theory:

> (1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.

Phillips, 515 F.3d at 235 (citing Bright, 443 F.3d at 281) (footnote omitted).  In Bright, the court emphasized that:

---

[11]D.R. was sixteen at the time of the incidents.  The other student (L.H.) was seventeen and thus not covered by the compulsory education law.  Id. at 1370.

> [l]iability under the state-created danger theory is predicated upon the states' <u>affirmative</u> acts which work to the plaintiff's detriments in terms of exposure to danger. <u>It is the misuse of state authority, rather than a failure to use it,</u> that can violate the Due Process Clause.

443 F.3d at 282 (quoting <u>D.R.</u>, 972 F.2d at 1374).

Principal Foriska states that at no time did D.J. or any parent ever complain to him about a hostile school environment with respect to race or disability, that he was unaware of and did not acquiesce in or approve of any bullying to which C.J. or any other Stevens student was subjected, that he never established or condoned a policy or practice to authorize anyone to cover up any physical or sexual assaults against students or others, and that he never retaliated or discriminated against C.J. or any other student on the basis of race or disability. He further states that the school had a Prevention and Intervention Specialist who taught and met with students and their parents regarding anger management, conflict mediation and bullying issues and that the school had a parent/teacher handbook with a code of conduct for students that was distributed at the beginning of the year; the code contained rules and regulations prohibiting assault, bullying, racial or sexual harassment or intimidation and sexual assault. (Foriska Aff. ¶¶ 3-9, 12.) Plaintiff has proffered no evidence to the contrary.

Mark Roosevelt, Superintendent of Pittsburgh Public Schools, similarly testifies that he was not aware of C.J. being subjected to a hostile school environment or bullying, that he never established or condoned a policy or practice to authorize anyone to cover up any physical or sexual assaults against students or others, and that he never retaliated or discriminated against C.J. or any other student on the basis of race or disability. (Roosevelt Aff. ¶¶ 2-8.)[12] Defendants

---

[12]Docket No. 36 Ex. B.

note that D.J. confirmed at her deposition that the only subjects about which she complained to school officials prior to January 3, 2007 concerned C.J.'s grades and an incident involving a stolen cell phone. (D.J. Dep. at 17, 34-35.) Thus, the record is undisputed that school officials were unaware of any problems C.J. was having with bullying or attacks at school prior to the incident on January 3, 2007. Moreover, after the incident occurred, the only evidence of record is that the School District Defendants met with D.J. the next day, suspended T.P. and moved C.J. to another homeroom. Plaintiff has not proffered any evidence that C.J. suffered any further harm after the incident because the School District Defendants failed to take action.

The School District Defendants argue that Plaintiff cannot meet any of the elements of the state-created danger theory: 1) both Foriska and Roosevelt have testified that they were unaware of a sexually hostile environment at Stevens and Plaintiff has submitted no evidence to the contrary; 2) not only did they not act in willful disregard to a threat, but they acted promptly by meeting with D.J. the next day, assigning C.J. to a new homeroom and suspending T.P.; 3) there is a relationship between C.J. and the state actors, but there is no connection between them and the private acts of Xavier and T.P.; and 4) they did not use their authority to create an opportunity for danger that otherwise would not have existed.

The School District Defendants have demonstrated that the state-created danger theory cannot be maintained in this case. The record establishes that school officials were aware of no threat before January 3, 2007, they acted promptly by taking action the next day (even if this action did not go as far as D.J. wanted, that does not mean that it rises to the level of deliberate indifference) and there is no established connection between Roosevelt and Foriska, on the one hand, and private actors T.P. and Xavier, on the other. Moreover, even assuming that Plaintiff

could meet the first three elements of the state-created danger theory, she cannot meet the fourth element. In D.R., the court concluded that a state-created danger theory (which it had not yet recognized) could not be applied because the school district took no affirmative action to create or increase the students' risk of danger. The plaintiffs noted that the school district had a unisex bathroom with a lock on it and a darkroom with a lock on it, but the harassment could have occurred even if the school room had two bathrooms and the locks were there for a proper purpose. The plaintiffs alleged that the class was placed under the supervision of an inadequately trained and supervised student teacher, but the court held that this act increased the risk of the students' receiving a poor education, not the kind of harm they suffered. The plaintiffs alleged that the state actors failed to report the incidents to parents or other individuals in authority, but the court held that this duty arose under state law, and the violation of state-law duties is not sufficient to state a claim under § 1983. Finally, the plaintiffs alleged that the defendants had failed to investigate and stop the misconduct, but the court held that these allegations indicated only nonfeasance, rather than affirmative acts of misfeasance which would be actionable. 972 F.2d at 1374-75.

In Morse v. Lower Merion School District, 132 F.3d 902 (3d Cir. 1997), the Court of Appeals held that the school district did not place a teacher in a dangerous environment stripped of means to defend herself and did not place her in a unique confrontational encounter when it allowed construction workers to use an unlocked back entrance to the school building, and a mentally unstable woman entered through this door and shot her. Their actions did increase the risk of harm, but this was not sufficient and the increased risk did not relate directly to the harm the teacher suffered. Id. at 914-15. See also Page by Page v. School Dist. of Phila., 45 F. Supp.

2d 457, 465 (E.D. Pa. 1999) (school officials did not meet fourth element when they failed to prevent attack on middle school student by other students, even when they had entered into an agreement with the parents of the victim to prevent her from being harmed).  Cf. Maxwell by Maxwell v. School Dist. of City of Phila., 53 F. Supp. 2d 787, 793 (E.D. Pa. 1999) (special education student met fourth element when school district defendants locked the classroom door, preventing her from leaving, teacher told disruptive students they could do what they wanted to as long as they did not bother her, teacher witnessed attempted rape of another student but did nothing and teacher saw two students take plaintiff and blackboard to the back of the room where they raped her but did nothing).  See also Phillips, 515 F.3d at 236-37 (when plaintiff alleged that co-workers provided 911 call center employee with information that he used to trace and shoot his former girlfriend, her new boyfriend and the girlfriend's sister, this was sufficient to state the affirmative act necessary to maintain a state-created danger theory of liability).

In this case, Roosevelt and Foriska cannot be said to have taken affirmative acts that placed C.J. in a more dangerous situation than she was otherwise in.  Plaintiff alleges that these individuals were aware of physical and sexual assaults occurring at Stevens but that it was their policy and practice to authorize certain administrators and teachers to cover up these acts.  However, she has submitted no evidence in support of this argument and Roosevelt and Foriska have testified that they were not aware of any incidents involving C.J. prior to the one that forms that basis for this case.  Therefore, there is no evidence to support the allegations of the Amended Complaint.

Moreover, Plaintiff has merely suggested that the School District Defendants may not have done enough to prevent C.J. from being harmed once they knew of the threat, not that they

increased the danger by, for example, locking her in a room with Xavier or T.P. or telling these students that they could do what they wanted.  Thus, even if the allegations of the Amended Complaint were supported, they would resemble the scenarios in <u>D.R.</u>, <u>Morse</u> and <u>Page</u>, not the situation in <u>Maxwell</u>, in which school officials took additional measures that increased the harm to the minor student.  Therefore, Plaintiff cannot maintain a Substantive Due Process claim against the School District Defendants for violating C.J.'s right to bodily integrity pursuant to the state-created danger theory of liability.

Equal Protection Claim

"To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination.  They must demonstrate that they 'receiv[ed] different treatment from that received by other individuals similarly situated.'" <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1478 (3d Cir. 1990) (quoting <u>Kuhar v. Greensburg-Salem Sch. Dist.</u>, 616 F.2d 676, 677 n.1 (3d Cir. 1980)).

The Court of Appeals for the Third Circuit has stated that a court's "first step in evaluating a claim that a law or government action violates the Equal Protection Clause is to determine the appropriate standard of review." <u>Donatelli v. Mitchell</u>, 2 F.3d 508, 513 (3d Cir. 1993) (citation omitted).  The more rigorous "strict scrutiny" test, under which a challenged state action will be upheld only if it advances a compelling state interest and is narrowly tailored to meet that interest, has generally been applied to two types of equal protection claims:

> (1) where the challenged action or legislation involves a "suspect" classification, i.e. a classification based on race, alienage, or national origin; and (2) where the challenged action infringes on fundamental constitutional rights, such as the right to travel or rights protected by the First Amendment.  Strict scrutiny is applied in such cases because classifications that are based on race or that infringe on

fundamental constitutional rights, are presumptively invalid and will not often be
justified by a legitimate state interest.

Id. (citations omitted).

In City of Cleburne, Texas v. Cleburne Living Center, Inc., 473 U.S. 432, 442-43 (1985),
the Supreme Court specifically held that mental retardation is not "a quasi-suspect classification
calling for a more exacting standard of judicial review than is normally accorded economic and
social legislation."  Plaintiff alleges that C.J. received different treatment because she has a
learning disability.  However, she cites no authority that would support the argument that
students with learning disabilities constitute a suspect class and, based on City of Cleburne, such
a category would not qualify.

On the other hand, race is a recognized category and Plaintiff alleges that C.J. received
unequal protection based on her race.  However, Plaintiff has not supported her equal protection
claim because she has not referred to any other incidents in which the students of a different race
who were harassed received more favorable responses from school officials than C.J. did.
Although Plaintiff has argued that C.J. received unequal protection of the laws, she has cited no
evidence to support this claim.  Therefore, she cannot maintain an equal protection claim in this
case.

Racial/Disability Discrimination under § 1981

Plaintiff argues in her brief that Defendants discriminated against C.J. on the basis of her
race (African-American) and learning disability in that they discredited her accounts of the
incident and refused to take any action.[13]  She notes that Stevens has a Code of Conduct which

_____

[13]The Amended Complaint does not contain a count under § 1981, but this statute is
(continued...)

states that "[b]ullying of any kind is unacceptable" and that students violating any of the policies of the school will be disciplined. (Pl.'s Ex. 2 at 5, 15.)[14]

Defendants move for summary judgment on these claims. They note that both Roosevelt and Foriska have categorically denied discriminating against C.J. because of her race. Moreover, Roosevelt is never alleged to have taken even one specific act regarding C.J. Plaintiff has not provided any support for her claim of racial discrimination in violation of § 1981,[15] and therefore this claim should be dismissed.

In summary, the claims contained in Count I of the Amended Complaint should be dismissed for the following reasons: 1) the First, Fourth and Fifth Amendment claims are unsupported by any allegations or facts; 2) the Fourteenth Amendment claim for deprivation of C.J.'s right to bodily integrity does not state a claim under the special relationship theory because being in school does not equate to "custody"; 3) it does state a claim under the state-created danger theory but the record fails to establish that the theory can be applied in this case; 4) the equal protection claim fails because Plaintiff has failed to point to incidents in which other students complained of harassment but received better treatment; and 5) to the extent that the

---

[13](...continued)
mentioned in the jurisdictional portion of the Amended Complaint (Am. Compl. ¶ 1) and in the allegation that Defendants are "persons" who acted with deliberate indifference to C.J.'s rights, including § 1981 (Am. Compl. ¶ 37). Plaintiff argues that she has stated a claim under § 1981 and Defendants have addressed it, therefore the Court will do so as well.

[14]Docket No. 48-3.

[15]Section 1981 does not apply to discrimination on the basis of disability. Singleton v. Mellon Fin. Corp., 2005 WL 2403722, at *4 n.1 (W.D. Pa. Sep. 29, 2005) (McVerry, J.) (citing Davies v. Polyscience, Inc., 126 F. Supp. 2d 391, 392-93 (E.D. Pa. 2001); Aramburu v. Boeing Co., 112 F.3d 1398, 1411 (10th Cir. 1997); Duane v. Gov't Employees Ins. Co., 784 F. Supp. 1209, 1216 (D. Md. 1992), aff'd, 37 F.3d 1036 (4th Cir. 1994)).

Amended Complaint contains a claim under § 1981, the claim fails because Plaintiff provides no support for it and Roosevelt and Foriska have denied discriminating against C.J. on the basis of her race. Therefore, with respect to Count I of the Amended Complaint, the School District Defendants' motion for summary judgment should be granted.

Count II: Conspiracy Claims

Plaintiff alleges that Defendants conspired to violate her civil rights, in violation of both § 1983 and § 1985(3). The School District Defendants contend that these allegations are unsupported by any evidence and that there can be no conspiracy to achieve a policy, practice or custom to deprive C.J. of her rights when no such policy, practice or custom existed. T.P. argues that she is not a state actor and that Plaintiff has presented no evidence of racial animus.

Conspiracy Claim Against T.P. Under § 1983

The Court of Appeals has stated that maintaining a conspiracy claim under § 1983 against a private individual for conspiring with a state actor is viable only if the defendants "somehow reached an understanding to deny [a plaintiff her] rights under § 1983." Kost v. Kozakiewicz, 1 F.3d 176, 185 (3d Cir. 1993) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)). The court went on to observe that "[e]stablishing the existence of this 'understanding,' however, is really nothing more than another way to show state action as required by § 1983 when a private party is alleged to have violated that statute." Id. (citing Adikes, 398 U.S. at 152).

Plaintiff has proffered no evidence from which a trier of fact could conclude that T.P., a minor student at Stevens, conspired with state actors to deprive C.J. of her rights in violation of § 1983. Moreover, the state actors, Roosevelt and Foriska, have testified that they had no knowledge of any threat or incident involving C.J. until the January 3, 2007 incident. Thus, there

is no evidence to hold any defendant liable and in addition T.P. is not a state actor and she cannot

be held liable under § 1983 for alleged conspiracy with the state officials.[16]

Conspiracy Under § 1985(3)

The Court of Appeals has stated that:

> Section 1985(3) permits an action to be brought by one injured by a
> conspiracy formed "for the purpose of depriving, either directly or indirectly, any
> person or class of persons of the equal protection of the laws, or of equal
> privileges and immunities under the laws." 42 U.S.C. § 1985(3).  In a line of cases
> beginning with Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d
> 338 (1971), the Supreme Court has made clear what a plaintiff must allege to state
> a claim under § 1985(3): "(1) a conspiracy; (2) for the purpose of depriving, either
> directly or indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws; and (3) an act in
> furtherance of the conspiracy; (4) whereby a person is injured in his person or
> property or deprived of any right or privilege of a citizen of the United States."
> United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29, 103 S.Ct.
> 3352, 77 L.Ed.2d 1049 (1983) (citing Griffin, 403 U.S. at 102-03, 91 S.Ct. 1790).

Farber v. City of Paterson, 440 F.2d 131, 134 (3d Cir. 2006).  Like § 1983, § 1985 "does not

create any substantive rights, but permits individuals to enforce substantive rights against

conspiring private parties."  Id. (citations omitted).

Plaintiff has pointed to no act in furtherance of any alleged conspiracy and, other than her

use of the word "conspiracy" in the Amended Complaint and briefs, the record contains no

evidence to support such a claim.  Without evidence to support it, this claim cannot be

maintained.  Therefore, with respect to Count II, the School District Defendants' motion for

summary judgment should be granted.

---

[16]It is noted that, if a guardian were to enter an appearance on behalf of Xavier, the
guardian undoubtedly would move to open the default and present the same arguments that T.P.
has made, including the argument that he is not a state actor.  The same result would obtain.

<u>Count III: Assault and Battery Claim</u>

In Count III, Plaintiff alleges that Xavier and T.P. subjected C.J. to assault and battery. T.P. moves for summary judgment on the ground that Plaintiff has not supported this claim with any evidence.

Judge Cohill recently summarized Pennsylvania law on these claims as follows:

> In order to establish a prima facie case for assault, a plaintiff must allege that the defendant acted "intending to cause imminent apprehension of a harmful or offensive bodily contact." <u>Restatement (Second) of Torts</u> § 21 (4th ed. 1989). To state a claim for battery, a plaintiff must allege that the defendant acted "intending to cause a harmful or offensive contact or an imminent apprehension of such contact and [an] offensive contact result[ed]." <u>Restatements (Second) of Torts</u> § 18 (4th ed. 1989); <u>see also</u> <u>Herr v. Booten</u>, 398 Pa. Super. 166, 580 A.2d 1115, 1117 (Pa. Super. 1990) (dismissing plaintiff's claim for battery when no harmful or offensive contact occurred).

<u>Bryan v. Erie County Office of Children & Youth</u>, 2006 WL 2850446, at *27 (W.D. Pa. Sep. 29, 2006).

The allegations of the Amended Complaint meet the elements for claims of assault and battery. However, this case has progressed beyond the pleading stage and Plaintiff is required to support the allegations of a complaint with evidence. Although T.P. admits crawling under the stall and unlocking the door, she denies that she assaulted C.J. and Mya states only that "three students" were hitting and kicking C.J. She does not name T.P. and thus there is no evidence to maintain a claim against her. Therefore, with respect to Count III, her motion for summary judgment should be granted.

<u>Count IV: Intentional Infliction of Emotional Distress Claim</u>

In Count IV, Plaintiff alleges that Defendants subjected C.J. to the intentional infliction of emotional distress by failing to stop the alleged harassment by Xavier and T.P. The School

District Defendants move for summary judgment on the grounds that they are immune and that there is no competent evidence as to Roosevelt and Foriska. T.P. argues that her behavior does not meet the level of "outrageous conduct" necessary to maintain this tort and that Plaintiff has not submitted medical evidence as is required to maintain such a claim.

The Pennsylvania Political Subdivision Tort Claims Act provides that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. C.S. § 8541. The Act then provides that:

> A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):
>
> (1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and
>
> (2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.

42 Pa. C.S. § 8542(a). The statute lists eight negligent acts for which recovery against the local agency is permitted: 1) vehicle liability; 2) care, custody or control of personal property; 3) care, custody or control of real property; 4) trees, traffic controls and street lighting; 5) utility service facilities; 6) streets; 7) sidewalks; and 8) care, custody or control of animals. 42 Pa. C.S. § 8542(b).

The School District Defendants argue that none of the exceptions listed in § 8542(b)

apply.  Remarkably, Plaintiff agrees:

> Although Plaintiff's claim of intentional infliction of emotional distress
> does not trigger any of the exceptions under § 8542, the Defendants immediately
> put C.J. back into harms way.  They refused to believe C.J.'s accounts of the
> incident.  As a learning disability child this was severe emotional distress and
> Defendants were authority figures and had control and custody over C.J. and
> intentionally put her into an emotional distressful [sic] situation.

(Docket No. 48 at 6-7.)  Regardless of the emotional argument in this paragraph, Plaintiff

concedes that none of the exceptions to local agency immunity apply.  Therefore, the School

District cannot be held liable for this claim.

With respect to Roosevelt and Foriska, who are local agency employees, another

Pennsylvania statute provides that:

> In any action against a local agency or employee thereof for damages on account
> of an injury caused by the act of the employee in which it is judicially determined
> that the act of the employee caused the injury and that such act constituted a
> crime, actual fraud, actual malice or willful misconduct, the provisions of sections
> 8545 (relating to official liability generally), 8546 (relating to defense of official
> immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on
> damages) shall not apply.

42 Pa. C.S. § 8550.  See Yakowicz v. McDermott, 548 A.2d 1330, 1333 & n.5 (Pa. Commw.

1988) (noting that Commonwealth employees are immune from liability even for intentional torts

but that *local agency employees* lose their immunity defense where their actions constitute a

crime, actual fraud, actual malice or willful misconduct), appeal denied, 565 A.2d 1168 (Pa.

1989).

However, Plaintiff has not alleged actual malice and, "as the Pennsylvania Supreme

Court has recognized, willful misconduct is a demanding level of fault."  Sanford v. Stiles, 456

F.3d 298, 315 (3d Cir. 2006).  In Sanford, a high school student (Sanford) sent a note to a girl

who had dated him but was now dating someone else in which he stated that the news "almost made me want to go kill myself." The girl contacted the school's guidance counselor (Stiles), who interviewed Sanford and concluded that he did not present any signs that he was thinking about suicide. Subsequently, Sanford committed suicide. However, the court held that the allegation that Stiles did not take enough action to prevent it did not rise to the level of willful misconduct so as to fall within § 8550.

Similarly, Plaintiff has alleged that Roosevelt and Foriksa failed to do enough to prevent the kind of incident that C.J. alleges she was subjected to in the school. These defendants have categorically denied that they were aware of any danger posed to C.J. prior to the incident and Plaintiff has not submitted any evidence to the contrary.[17] Therefore, the School District Defendants cannot be held liable for this claim.

With respect to T.P., Plaintiff has not cited any authority to support the argument that her act of unlocking the door to the bathroom stall by itself rises to the level of conduct that would go so far "beyond all possible bounds of decency" that it would be "regarded as atrocious, and utterly intolerable in a civilized society." Kazatsky v. King David Memorial Park, Inc., 527 A.2d 988, 990-91 (Pa. 1987). Moreover, in that case, the Pennsylvania Supreme Court held that, "if section 46 of the Restatement is to be accepted in this Commonwealth, at the very least, existence of the alleged emotional distress must be supported by competent medical evidence." Id. at 995. Plaintiff has not proffered any medical evidence to support C.J.'s claim of intentional infliction of emotional distress. Therefore, with respect to Count IV, the School District

---

[17]Even based on the allegations of the Amended Complaint, the conduct of Roosevelt and Foriska, even if arguably negligent, could not have risen to the level of willful misconduct so as to fall within § 8550.

Defendants' motion for summary judgment should be granted and T.P.'s motion for summary judgment should also be granted.

Count V: Negligence

In Count V, Plaintiff alleges a claim of negligence against the School District Defendants. They move for summary judgment on the ground of local agency immunity.

Plaintiff contends that "Defendants are not immune against liability for damages because a young child is not cognizant of their practical freedom to flee a dangerous environment or otherwise break boundaries and challenge authority." (Docket No. 48 at 7) (citing Ingraham, 430 U.S. at 670).

Regardless of whether a federal court would recognize a different standard for a § 1983 claim brought by a "very young" child on the ground that such child is in the equivalent of state custody because she cannot appreciate that she can leave a dangerous environment (and as explained above, there is no basis for concluding that such an argument survives scrutiny in the Third Circuit), state law clearly indicates that local agencies are entitled to immunity from negligence claims, which are not enumerated among the exceptions in § 8542(b). Moreover, Plaintiff has not pointed to any evidence that Roosevelt and Foriska had or breached a legal duty to protect C.J. from harassment by fellow students. Therefore, with respect to Count V, the School District Defendants' motion for summary judgment should be granted.

Finally, with respect to Defendant Xavier, although a default has been entered against him, if a guardian appeared on his behalf, the same conclusions drawn here would be applicable and summary judgment in his favor would apply. In addition, from representations made here it appears that he is in all likelihood judgment proof. Thus, rather than have this case hang in

31

abeyance indefinitely, the Court should opt to exercise its discretion and likewise dispose of the case against Xavier also.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of defendants Stevens Elementary School, Mark Roosevelt, and Joseph Foriska (Docket No. 35) be granted. It is further recommended that the motion for summary judgment submitted on behalf of defendant T.P. (Docket No. 37) be granted, that the case be dismissed as to Defendant Xavier and the judgment be entered accordingly.

Within thirteen (13) days after being served, any party may serve and file written objections to the Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
Robert C. Mitchell
United States Magistrate Judge

Dated: September 22, 2008